Porter H. MITCHELL,
Plaintiff–Appellee/Cross–Appellant,

v.

MOBIL OIL CORPORATION, a New York corporation; Retirement Plan of Mobil Oil Corporation; and Trustees of the Retirement Plan of Mobil Oil Corporation, Defendants–Appellants/Cross–Appellees.

Erisa Industry Committee and Association of Private Pension and Welfare Plans, Amici Curiae.

Nos. 89–1019, 89–1031, 89–1085 and 89–1111.

United States Court of Appeals, Tenth Circuit.

Feb. 16, 1990.

Rodney Patula (Thomas L. Roberts, Peter H. Ziemke, W. Randolph Barnhart, and Peter W. Pryor, with him on the briefs) of Pryor, Carney & Johnson, Englewood, Colo., for plaintiff-appellee/cross-appellant.

Michael E. Tigar of the University of Texas Law School (Steven J. Merker of Davis, Graham & Stubbs, Denver Colo., and Loren Kieve, Standish F. Medina, Jr., and Jonathan E. Richman of Debevoise & Plimpton, Washington, D.C., with him on the brief), Austin, Tex., for defendants-appellants/cross-appellees.

Harris Weinstein, John M. Vine, and Dwight C. Smith III of Covington & Burling, Washington, D.C., for amicus curiae Erisa Industry Committee.

Paul J. Ondrasik, Melanie Franco Nussdorf, Suzanne E. Meeker, and Theodore E. Rhodes of Steptoe & Johnson, Washington, D.C., for amicus curiae Ass'n of Private Pension and Welfare Plans.

Before MOORE and ANDERSON, Circuit Judges, and DAUGHERTY, District Judge.*

---

* The Honorable Frederick A. Daugherty, Senior District Court Judge for the Western District of Oklahoma, sitting by designation.

JOHN P. MOORE, Circuit Judge.

In this case, the Mobil Oil Corporation and one of its former employees, Porter Mitchell, dispute whether changes which Mobil made in its employee benefit plan violated the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634, and the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461. At trial, Mr. Mitchell succeeded on his age-discrimination and ERISA claims. Mobil challenges the results below, claiming that Mr. Mitchell did not meet his burden of proof on the age-discrimination claim and that he did not have standing to seek relief under ERISA. We agree with Mobil and reverse.

## I. FACTS

Until 1977, Mobil provided retirement benefits only in the form of an annuity. In 1977, Mobil added a "lump-sum option" to its retirement plan, the terms of which, for the purposes of this case, appear in the Retirement Plan of Mobil Oil Corporation as of January 1, 1984 (the Plan). Under the Plan, an employee could elect to receive a lump-sum payment which had the same equivalent actuarial value, discounted at 5%, as the annuity. In the case of early retirement, the Plan reduced the lump-sum payment by 5% for each year of retirement prior to the age of sixty. To qualify for the lump-sum option, an employee had to elect this option prior to retirement; had to be over fifty-five; and, at the date of his retirement, had to have a net worth of at least $250,000 or an accumulated lump sum in excess of $250,000.

In February 1984, Mobil amended the lump-sum option. It raised the discount rate prospectively from 5% to 9.5% and increased the eligibility threshold from $250,000 to $450,000. It also linked the new threshold to the Consumer Price Index (CPI), projecting a rise in the threshold to correlate with a rise in the CPI. These changes, however, would not take effect until at least six months after Mobil announced them, pending approval by the IRS. The delayed effective date gave employees who were eligible for the lump-sum payment under the old criteria, but who might not meet the new threshold, the opportunity to decide whether to retire and take the lump sum or to continue working and accumulating more pension benefits with the possibility that they might not accumulate sufficient additional benefits to meet the new threshold requirement at the date of their retirement.

Porter Mitchell was one of Mobil's employees who had to make such a choice. He was fifty-six at the time Mobil amended the eligibility criteria for the lump-sum option and had elected to take this option instead of the annuity. He was clearly eligible for the lump-sum option under the $250,000 threshold but was uncertain whether he would be able to meet the $450,000 threshold since it could rise, prior to his retirement, with changes in the CPI. This choice was important to Mr. Mitchell because at the time he was making it, the market interest rate was over 9%. As a result, his lump sum, discounted at 5%, was worth approximately 140% more than his annuity.

At trial, Mr. Mitchell claimed that by forcing him to make this choice, Mobil had willfully violated the ADEA since it had, in effect, constructively discharged him because of his age. He also claimed that Mobil had breached its fiduciary duties under ERISA and that it had violated ERISA's anti-cutback provision, 29 U.S.C. § 1054(g), by retroactively limiting his right to the lump-sum option, an accrued benefit. The age-discrimination and ERISA claims were tried jointly before a jury, though, the trial court reserved for itself a decision on the ERISA claims.

The jury returned a verdict in favor of Mr. Mitchell, awarding $405,962.76 in back-pay damages; $86,000 as compensation for the 20% reduction in Mr. Mitchell's lump-sum benefit; and, $96,740.82 in front-pay damages. Because the jury found that Mobil's violation of the ADEA was willful, the trial court awarded Mr. Mitchell $405,-962.76 in liquidated damages as well. The court rejected Mr. Mitchell's claim for pre-judgment interest on his ADEA claim. The trial court also ruled in favor of Mr. Mitch-

ell on his ERISA claims, awarding him $588,703.58 in compensatory damages and $405,962.76 in liquidated damages. Mobil appeals both the jury's verdict and the trial court's judgment. Mr. Mitchell cross-appeals the trial court's measure of damages.

## II. THE ADEA CLAIM

### A. MR. MITCHELL'S PRIMA FACIE CASE

■ The ADEA prohibits an employer from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To establish a prima facie case of age discrimination by constructive discharge, an employee must prove that his "employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." *Derr v. Gulf Oil Corp.,* 796 F.2d 340, 344 (10th Cir.1986). An employee who claims that an offer of early retirement constitutes age discrimination by constructive discharge can meet this burden by demonstrating that the offer "sufficiently alters the status quo that each choice facing the employee makes him worse off" and that if he refuses the offer and decides to stay, his employer will treat him less favorably than other employees because of his age. *Bodnar v. Synpol, Inc.,* 843 F.2d 190, 193 (5th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988). An early retirement program which requires an employee to make the difficult choice between retirement with the receipt of previously unavailable incentives and continued work under the same conditions, however, does not result in constructive discharge because the employee is no worse off whichever option the employee chooses. *Henn v. Nat'l Geographic Soc'y,* 819 F.2d 824 (7th Cir.), *cert. denied,* 484 U.S. 964, 108 S.Ct. 454, 98 L.Ed.2d 394 (1987); *Schuler v. Polaroid Corp.,* 848 F.2d 276 (1st Cir.1988).

■ Mobil claims that since Mr. Mitchell did not establish a prima facie case of age discrimination by constructive discharge, the trial court erred in rejecting its motion for a directed verdict on the ADEA claim. We will reverse the trial court's denial of a motion for a directed verdict only if, viewed in the light most favorable to the nonmoving party, the evidence and all reasonable inferences to be drawn therefrom point but one way, in favor of the moving party. *Zimmerman v. First Federal Sav. & Loan Ass'n,* 848· F.2d 1047, 1051 (10th Cir.1988).

■ Mobil first contends that the trial court erred in denying its motion for a directed verdict because *Derr* precludes recovery for violations of the ADEA absent a showing that an employer subjected its employee to difficult or intolerable working conditions. 796 F.2d at 344. Mr. Mitchell himself admitted at trial that his working conditions were not unpleasant, that he was well regarded by his superiors, and that he enjoyed his work at Mobil. The fact that Mr. Mitchell was happy at Mobil and worked harmoniously with his colleagues and superiors, however, does not preclude a finding that Mobil's offer of early retirement constituted age discrimination by constructive discharge. The relevant question in this case is whether Mobil's amendment of the Plan forced Mr. Mitchell, and similarly situated employees, to choose between two options both of which would leave him worse off than the status quo.

Mobil contends that it did not confront Mr. Mitchell with such a choice. Instead, it gave him an extra benefit unavailable to employees under the age of fifty-five, the choice to elect the lump-sum option at the $250,000 threshold. Mobil's argument is disingenuous. Its program, unlike that in *Henn,* 819 F.2d at 826, did not give Mr. Mitchell a choice between the receipt of a previously unavailable early retirement incentive and the continuation of work under the status quo which preceded the offer of early retirement. Instead, Mobil created a choice between two options either of which would leave Mr. Mitchell worse off than he had been prior to the change in the Plan.

One choice would permit Mr. Mitchell to retire by February 1, 1985, at the age of fifty-six, and receive the lump-sum option under the old eligibility criteria. Prior to Mobil's amending the Plan, however, Mr. Mitchell could have worked until the age of sixty-five and still remain eligible for the lump-sum option under the old criteria. The other choice would permit Mr. Mitchell to continue working, but whereas prior to the Plan's amendment he could be certain to qualify for the lump-sum option, now, because Mobil had increased the threshold and linked it to the CPI, he would have to requalify for this benefit for which he had already become eligible at the age of fifty-five. Moreover, he would never be certain that he could achieve the potentially increasing threshold by retirement age.

As Mobil points out, to establish a prima facie case of age discrimination by constructive discharge, Mr. Mitchell had to prove not only that Mobil confronted him with a choice between two evils but also that Mobil would have treated him and other older employees less favorably, because of their age, had they remained on the job. Mobil asserts that since all employees were subject to the new eligibility criteria, Mr. Mitchell cannot demonstrate that the amendment of the Plan adversely affected him because of his age. Like Mr. Mitchell, employees under the age of fifty-five who had accumulated pension benefits in excess of $250,000, but less than $450,000, or who had a net worth of between $250,000 and $450,000, also lost the opportunity to obtain the lump-sum benefit under the old criteria. Indeed, for this group of employees that opportunity was irretrievably lost, whereas Mr. Mitchell could still take advantage of it if he chose to retire prior to February 1, 1985.

■ Mobil's argument ignores the Plan's requirement that an employee be over the age of fifty-five before he can qualify for the lump-sum benefit. Although Mobil's employees who were under age fifty-five at

the time Mobil amended the eligibility criteria might have expected to obtain the lump-sum benefit, none of them qualified for it at that time; consequently, only employees over the age of fifty-five who had already qualified to receive the lump-sum benefit, like Mr. Mitchell, would have to *requalify* for it under the new eligibility criteria if they decided to stay on the job. Since Mr. Mitchell did establish, as a matter of law, that he had been constructively discharged because of his age, the trial court properly denied Mobil's motion for a directed verdict.

### B. THE JURY CHARGE ON MR. MITCHELL'S PRIMA FACIE CASE

■ This court will find reversible error in a trial court's jury instructions only if we have substantial doubt whether the instructions, taken together, properly guided the jury in its deliberations. *Lutz v. Weld County School Dist. No. 6*, 784 F.2d 340, 341 (10th Cir.1986). The paradigmatic instruction on the element of intolerability in a constructive discharge case is "whether the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." *Derr*, 796 F.2d at 344. A trial court should, however, tailor this instruction to fit the facts of the case. *See Paolillo v. Dresser Indus., Inc.*, 865 F.2d 37, 40 (2d Cir.1989).[1]

Mobil contends that the trial court made two errors in its constructive discharge instructions. First, the court did not require the jury to find, as stated in *Derr*, that Mr. Mitchell's working conditions were intolerable or difficult. Instead, the court instructed the jury that it could find constructive discharge by forced retirement if "a reasonable person would also have felt compelled to retire under the circumstances with which Mr. Mitchell was faced in 1984 and 1985." We have no doubt that this instruction properly guided the jury in its

---

1. Indeed, trial judges should always avoid verbatim adoption of language from appellate opinions to formulate instructions. That which is meaningful to those with a legal education is often lost upon others; therefore, a carefully crafted instruction always is tailored to fit the case in language non-lawyers will comprehend.

deliberations. An instruction patterned after the *Derr* paradigm is particularly apt in cases where an employee, who is a member of a protected class, claims that an employer forced the employee to resign by creating on-the-job conditions directed specifically at that employee. It is less suitable where, as here, an employee claims that the employer's offer of early retirement constitutes age discrimination by constructive discharge. The instruction given takes this distinction into account and is, therefore, properly tailored to the facts of the case.

■ Mobil also assigns as error the trial court's failure to require the jury to find a link between the choice which Mobil imposed upon Mr. Mitchell by amending the Plan and Mr. Mitchell's age. It specifically objects to the following instruction:

> [T]o take early retirement constitutes constructive discharge, one, if the decision is induced by withholding or reducing or threatening to withhold or reduce benefits from those who choose not to retire, or, two, if each choice facing the employee as a result of the change in the threshold provisions of the retirement plan leaves him worse off than before.[2]

Mobil ignores, however, the trial court's preliminary instruction that Mr. Mitchell "must prove that Mobil's specific employment practices or policies adversely affected people in his age group at a substantially higher rate than they affected those in younger age groups." Since these instructions, taken together, properly state the law governing this case, we reject Mobil's claim that the trial court improperly instructed the jury.

## C. RETROACTIVE APPLICATION OF PUBLIC EMPLOYEES RETIREMENT SYSTEM OF *OHIO v. BETTS*

After trial and after Mr. Mitchell filed his Reply Brief, the Supreme Court decided

*Public Employees Retirement Sys. of Ohio v. Betts*, —— U.S. ——, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989), which redefined the elements of a prima facie case of age discrimination based on changes in an employer's benefits plan by reinterpreting § 4(f)(2) of the ADEA, 29 U.S.C. § 623(f)(2). That section exempts from liability under the ADEA any employer who "observe[s] the terms of . . . any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of" the ADEA. Prior to *Betts*, this court and several other courts of appeal held that an employer had the burden of establishing as an affirmative defense that its early retirement program fell within the exemption of § 4(f)(2) by proving that (1) its plan was bona fide; (2) its actions were in observance of the terms of the plan; and, (3) its plan was not a subterfuge to evade the purposes of the Act. *EEOC v. Cargill, Inc.*, 855 F.2d 682, 684 n. 2 (10th Cir.1988); *EEOC v. Westinghouse Elec. Corp.*, 725 F.2d 211, 223 (3d Cir.1983), *cert. denied*, 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984); *Karlen v. City Colleges of Chicago*, 837 F.2d 314, 318 (7th Cir.), *cert. denied*, 486 U.S. 1044, 108 S.Ct. 2038, 100 L.Ed.2d 622 (1988). An employer could disprove subterfuge by showing a cost-based justification for age-related reductions in benefits. *See Karlen*, 837 F.2d at 319; *EEOC v. City of Mt. Lebanon*, 842 F.2d 1480, 1492 (3d Cir.1988); 29 C.F.R. § 860.120(a)(1), (d)(1)–(3) (1980), redesignated 29 C.F.R. § 1625.10(a)(1), (d)(1)–(3) (1988).

■ The *Betts* court implicitly overruled this prior case law. It held that § 4(f)(2) is not an affirmative defense which the employer has the burden of prov-

---

**2.** The Association of Private Pension and Welfare Plans, as *amicus curiae*, asserts that the first alternative in this jury charge would effectively outlaw voluntary early retirement programs by prohibiting employers from offering special incentives that will not be available to those who choose to remain employed. Read out of context, the jury charge does support this interpretation which would misstate the law. When the jury instructions are read as a whole, however, the trial court's reference to the "withholding or reducing or threatening to withhold or reduce benefits from those who choose not to retire" clearly addresses those situations in which the employer uses a stick, the reduction or withholding of benefits to which the employee was entitled prior to the offer of early retirement, to force employees to accept an offer of early retirement.

ing, but rather part of the plaintiff's prima facie case. 109 S.Ct. at 2868. Under *Betts,* an employee who claims that his employer's benefits program violates the ADEA bears the burden of proving subterfuge by showing "that the discriminatory plan provision actually was intended to serve the purpose of discriminating in some nonfringe-benefit aspect of the employment relationship," such as hiring and firing or wages and salaries. *Id.* We must now determine whether, as Mobil contends, *Betts* should be retroactively applied to this case.

Our determination whether to apply *Betts* retroactively requires the weighing of three factors: (1) whether *Betts* "establish[es] a new principle of law, either by overruling clear past precedent on which litigants may have relied ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed"; (2) whether, after looking at the prior history of the *Betts* rule and at its purpose and effect, "retrospective operation will further or retard its operation"; and, (3) whether retroactive application of the *Betts* rule would be inequitable. *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 355–56, 30 L.Ed.2d 296 (1971) (citations omitted). Each factor need not compel prospective application. *Jones v. Consolidated Freightways Corp.,* 776 F.2d 1458, 1460 (10th Cir.1985). Where, for example, a decision " 'could produce substantial inequitable results if applied retroactively, there is ample basis ... for avoiding the "injustice or hardship" by a holding of nonretroactivity.' " *Chevron,* 404 U.S. at 107, 92 S.Ct. at 355 (quoting *Cipriano v. City of Houma,* 395 U.S. 701, 706, 89 S.Ct. 1897, 1900, 23 L.Ed.2d 647 (1969) (per curiam)).

*Betts* clearly established a new principle of law by transforming what had been an affirmative defense into an element of an employee's prima facie case. Prior to *Betts,* every circuit which addressed the applicability of § 4(f)(2) to claims of age discrimination in employee benefit programs viewed it as an affirmative defense. *Potenze v. New York Shipping Ass'n, Inc.,* 804 F.2d 235, 237 (2d Cir.1986), *cert. denied,* 481 U.S. 1029, 107 S.Ct. 1955, 95

L.Ed.2d 528 (1987); *EEOC v. City of Mt. Lebanon,* 842 F.2d 1480, 1488 (3d Cir.1988); *Crosland v. Charlotte Eye, Ear and Throat Hosp.,* 686 F.2d 208, 211 (4th Cir. 1982); *Betts v. Hamilton County Bd. of Mental Retardation and Developmental Disabilities,* 848 F.2d 692, 694–95 (6th Cir. 1988), *rev'd sub nom. Public Employees Retirement Sys. of Ohio v. Betts,* —— U.S. ——, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989); *Karlen v. City Colleges of Chicago,* 837 F.2d 314, 318 (7th Cir.), *cert. denied,* 486 U.S. 1044, 108 S.Ct. 2038, 100 L.Ed.2d 622 (1988); *EEOC v. Borden's, Inc.,* 724 F.2d 1390, 1395 (9th Cir.1984); *EEOC v. Cargill, Inc.,* 855 F.2d 682, 684 (10th Cir.1988). None even considered that § 4(f)(2) established an element of plaintiff's prima facie case. This *Chevron* factor, therefore, strongly favors nonretroactive application of *Betts.*

Retroactive application of *Betts* in this case would not further the purpose behind its new interpretation of § 4(f)(2): to exempt "the provisions of a bona fide benefit plan from the purview of the ADEA so long as the plan is not a method of discriminating in other, nonfringe-benefit aspects of the employment relationship." 109 S.Ct. at 2866. Mr. Mitchell asserts that Mobil constructively discharged him because of his age by manipulating the availability of the lump-sum benefit. In other words, Mr. Mitchell claims that Mobil used its benefit plan to discriiinate against him in a nonfringe-benefit aspect of the employment relationship. His claim is exactly the type from which the *Betts* court did not intend to insulate employers. Retroactively applying *Betts,* however, would, in effect, insulate Mobil from Mr. Mitchell's claim because Mr. Mitchell did not present as part of his prima facie case evidence of Mobil's intent to use the amendment of the lump-sum provision to discriminate against him in a nonfringe-benefit aspect of the employment relationship. The second *Chevron* factor, therefore, also weighs against retroactive application of *Betts.*

Considerations of equity also undercut Mobil's contention that *Betts* should be applied retroactively. Mobil first mentioned

§ 4(f)(2) in its Reply Brief, filed just over two weeks after *Betts* was decided. Despite the fact that § 4(f)(2) was available to Mobil as an affirmative defense prior to *Betts*, Mobil did not plead that defense in its Answer or in its Answer to the Amended Complaint. Not surprisingly, Mr. Mitchell presented no evidence at trial on the applicability of § 4(f)(2) to his claims, nor did Mobil. Since this case proceeded for over three years prior to Mobil's filing its Reply Brief—through discovery, trial, and initial briefing on appeal—without any mention of § 4(f)(2) as an affirmative defense for Mobil, it would work a grave injustice for us to hold that *Betts* applies retroactively.[3] This result is one which we must avoid.

## D. MOBIL'S BUSINESS JUSTIFICATION AND MR. MITCHELL'S CLAIM OF PRETEXT

█ If an employee establishes his prima facie case of age discrimination by constructive discharge, the employer then has the opportunity to rebut the presumption of discrimination by producing evidence of a legitimate, nondiscriminatory business reason for its conduct. *EEOC v. University of Oklahoma*, 774 F.2d 999, 1002 (10th Cir.1985), *cert. denied*, 475 U.S. 1120, 106 S.Ct. 1637, 90 L.Ed.2d 183 (1986); *Connecticut v. Teal*, 457 U.S. 440, 446–47, 102 S.Ct. 2525, 2530–31, 73 L.Ed.2d 130 (1982). To prevail, the employee must then prove that the employer's proffered justification is "a mere pretext for discrimination." *Teal*, 457 U.S. at 447, 102 S.Ct. at 2530. The employee can establish pretext "by showing that the employer's proffered explanation is unworthy of credence." *University of Oklahoma*, 774 F.2d at 1002.

Mobil claims that since it forwarded a legitimate business justification and Mr. Mitchell failed to prove that it was a pretext, the trial court erred in denying its motion for a directed verdict. We will reverse the trial court's denial of a motion for a directed verdict only if, viewed in the light most favorable to the nonmoving party, the evidence and all reasonable inferences to be drawn therefrom point but one way, in favor of the moving party. *Zimmerman*, 848 F.2d at 1051. Alternatively, Mobil claims that the evidence was insufficient to support the jury's finding in favor of Mr. Mitchell on this issue. We will uphold the jury's verdict unless it is clearly erroneous, or there is a lack of evidence to support it. *Colorado Coal Furnace Distribs. v. Prill Mfg.*, 605 F.2d 499, 502 (10th Cir.1979).

█ At trial, Mr. Mitchell claimed that Mobil's raising the eligibility threshold for the lump sum from $250,000 to $450,000 and linking it to the CPI combined with its delaying for six months the effective date of these changes forced him to choose early retirement, resulting in age discrimination by constructive discharge. Mobil introduced evidence to justify both of these amendments to the Plan. It claimed that because inflation had eroded the real dollar value of the $250,000 threshold, which had been set in 1977, the number of employees who were eligible for, and taking advan-

---

**3.** In *Robinson v. County of Fresno*, 882 F.2d 444 (9th Cir.1989), the Ninth Circuit applied *Betts* retroactively without resorting to the *Chevron* inquiry. In that case, Mr. Robinson, an employee of the County of Fresno, claimed that a modification to the County's retirement plan violated the ADEA because it resulted in his receiving a smaller pension than other retirees who were younger at the time of hiring. *Id.* at 445. The Ninth Circuit affirmed the district court's granting of the County's motion for summary judgment because Mr. Robinson had not established, as *Betts* requires, that the county intended the modification to the plan to discriminate against him in an aspect of the employment relationship unrelated to fringe benefits. *Id.* at 447.

We believe that even if the Ninth Circuit had applied the *Chevron* test, the result would have been the same. *Robinson*, nonetheless, is distinguishable from this case. Mr. Robinson did not assert, as Mr. Mitchell does, that the modification to the County's plan discriminated against him in a nonfringe-benefit aspect of the employment relationship such as hiring and firing or wages and salaries. A refusal to apply *Betts* retroactively, therefore, would have retarded the purpose behind that decision. In addition, since *Robinson* was only at the summary judgment stage at the time *Betts* was decided, applying *Betts* retroactively would not result in the high degree of injustice which retroactive application would cause in this case.

**472**

tage of, the lump-sum option had increased dramatically, creating a serious drain on Mobil's pension fund. By increasing the threshold to $450,000 and linking it to the CPI, Mobil would both restore the threshold to the equivalent of its original level in 1977 dollars and protect it from future erosion by inflation. These changes in turn would stop the drain on Mobil's pension plan resulting from the overutilization of the lump-sum option.

Mobil claimed that it delayed the effective date of these changes, rather than implementing them immediately, out of fairness to its employees. The six-month notice period would give Mobil employees an adequate transition period to consider their choice rather than simply pulling the rug out from under them. It would also give retiring employees, who were earning their peak salaries, six months to accrue additional pension benefits since Mobil calculated these benefits based on a retiring employee's highest average salary over a period of thirty-six months.

At trial, Mr. Mitchell asserted that these justifications were unworthy of credence. He contended that Mobil amended the Plan in the manner it did to force the retirement of older Mobil employees who would become redundant as a result of an impending merger with Superior Oil Company. Mr. Mitchell asserted that Mobil needed to force these employees into early retirement to avoid large severance payments which the merger agreement required it to make to Superior employees laid off as a result of the merger. Mobil could achieve this objective only by combining an increase in the threshold with a notice period during which employees would be forced to retire early to obtain the lump-sum benefit.

Mr. Mitchell contends that several circumstances which he proved support his claim of pretext. In September 1983, mid-level Mobil executives began considering alternatives to the $250,000 threshold. In mid-December, the Mobil executive primarily responsible for changes to the Plan informed his superior—the Vice President for Employee Relations, who was also a member of the Executive Committee of Mobil's Board of Directors—that an increase in the threshold would require notice to employees and a transition plan to control the accelerated retirements of employees eligible for the lump sum. On January 9, 1984, the Executive Committee requested the Vice President for Employee Relations to continue the evaluation of an increase in the threshold and directed him to incorporate into future proposals for change a reasonable transition period between the announcement of the increased threshold and its effective date during which employees could take advantage of the old eligibility criteria.

On February 9, 1984, Mobil's Executive Committee adopted the increase in the threshold to $450,000 and linked it to the CPI. It also decided to give employees at least six months' notice of this change so they could retire and obtain the lump sum under the old eligibility requirements. The Executive Committee recognized that the announcement of an increase in the threshold approximately six months prior to the effective date of the change would lead to the early retirement of between 1000 and 1300 employees.

One week prior to its February 9 meeting, the Executive Committee reviewed "at length"[4] the possibility of a merger with Superior and authorized Mobil's President to proceed with negotiations. Mr. Mitchell contends that because the Executive Committee reviewed the opportunity to merge with Superior at length on February 2, 1984, one can reasonably infer that the Executive Committee knew about the redundancy problem which would result from the merger prior to January 9, 1984, when it directed the Vice President for Employee Relations to incorporate a notice period into any future proposals for changes to the Plan. Mr. Mitchell produced no evidence to support this inference, however, and the

4. See "Excerpt from Minutes of Executive Committee Meeting held on Thursday, February 2, 1984." (Addendum to Brief of Mobil Oil Corporation, Plaintiff's Exhibit 177). The term "at length" is not defined in the minutes, and we find no other description in the record indicating the length of the review or what it entailed.

record does not otherwise indicate any link between Mobil's merger with Superior and the Executive Committee's decision at its January 9 meeting to incorporate a notice period into any future changes in the Plan. In fact, the evidence points the other way since the Executive Committee adopted the transition period just one week after it authorized Mobil's President to negotiate with Superior and over one month before Mobil and Superior signed the merger agreement. The inference which Mr. Mitchell asks us to draw, therefore, is not a reasonable one, and his claim of pretext must fail. *See Sunward Corp. v. Dun & Bradstreet, Inc.,* 811 F.2d 511, 521 (10th Cir.1987) (quoting *Tose v. First Pennsylvania Bank, N.A.,* 648 F.2d 879, 895 (3d Cir.), *cert. denied,* 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981)) ("An inference is reasonable where 'there is a reasonable probability that the conclusion flows from the proven facts.' ")

Since Mr. Mitchell did not meet his burden of production on the issue of pretext, the onerous effects of the changes in the plan notwithstanding, we reverse the trial court's denial of Mobil's motion for a directed verdict. Because we hold that Mobil did not violate the ADEA, we need not review Mr. Mitchell's cross-appeal on issues relating to the measure of damages.

## III. THE ERISA CLAIMS

At trial, Mr. Mitchell claimed that Mobil's amendments to the Plan violated both § 204(g) of ERISA, 29 U.S.C. § 1054(g), which prohibits employers from reducing the accrued benefits of participants in a benefit plan, and § 510 of ERISA, 29 U.S.C. § 1140, which prohibits an employer from discriminating against a participant "for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." Mr. Mitchell also claimed that Mobil breached its duty as the fiduciary of the Plan by amending the Plan in the manner that it did. After determining that Mr. Mitchell met ERISA's requirements for standing, the district court held in his favor on all of his ERISA claims and awarded him $588,703.58 in compensatory damages and $405,962.76 in liquidated damages. Mobil challenges the district court's conclusion that Mr. Mitchell had standing as well as its holdings in his favor. Since Mobil's appeal involves pure questions of law, our review of the trial court's holdings is *de novo. Sage v. Automation, Inc. Pension Plan and Trust,* 845 F.2d 885, 890 (10th Cir.1988).

■ ERISA and its legislative history emphasize Congress's intent to provide those protected by the Act "ready access to the federal courts," 29 U.S.C. § 1001(b), and liberal remedies. *See* S.Rep. No. 127, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 4639, 4838, 4871;[5] H.R.Rep. No. 533, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 4639, 4647.[6] Although the Act has a broad remedial purpose, only participants, beneficiaries, and fiduciaries of an employee benefit plan may avail themselves of its protections. 29 U.S.C. § 1132(a). This limitation on the group of potential claimants is necessary to avoid the creation of uncertainties about an employer's obligations under ERISA and to prevent the imposition of "great costs on pension plans for no legislative purpose."

---

5. This report of the Senate Labor and Public Welfare Committee states:

> The enforcement provisions [of ERISA] have been designed specifically to provide both the Secretary [of Labor] and *participants and beneficiaries* with broad remedies for redressing or preventing violations of the [Act].... The intent of the Committee is to provide the full range of legal and equitable remedies available in both state and federal courts and to remove jurisdictional and procedural obstacles which in the past appear to have hampered effective enforcement of fiduciary re-

sponsibilities under state law or recovery of benefits *due participants.*
(Emphasis added.)

6. This report of the House Committee on Education and Labor states:

> [T]he Committee recognizes the absolute need that safeguards for *plan participants* be sufficiently adequate and effective to prevent the numerous inequities to workers under plans which [inequities] have resulted in tragic hardship to so many.
(Emphasis added.)

*Saladino v. I.L.G.W.U. Nat'l Retirement Fund,* 754 F.2d 473, 476 (2d Cir.1985).

ERISA defines a "participant" as "any employee or former employee of an employer ... who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer." 29 U.S.C. § 1002(7). This definition includes "former employees who 'have ... a reasonable expectation of returning to covered employment' or who have 'a colorable claim' to vested benefits." *Firestone Tire and Rubber Co. v. Bruch,* — U.S. —, 109 S.Ct. 948, 958, 103 L.Ed.2d 80 (1989) (quoting *Kuntz v. Reese,* 785 F.2d 1410, 1411 (9th Cir.) (per curiam), *cert. denied,* 479 U.S. 916, 107 S.Ct. 318, 93 L.Ed.2d 291 (1986)). It excludes, however, former employees who have received a lump-sum payment of all their vested benefits because "these erstwhile participants have already received the full extent of their benefits and are no longer eligible to receive future payments." *Joseph v. New Orleans Electrical Pension & Retirement Plan,* 754 F.2d 628, 630 (5th Cir.), *cert. denied,* 474 U.S. 1006, 106 S.Ct. 526, 88 L.Ed.2d 458 (1985). These claimants seek a damage award, not vested benefits improperly withheld. *Kuntz,* 785 F.2d at 1411. The fact that an employee takes his lump sum under protest does not preserve his standing as long as an employer properly pays out all the vested benefits owed to the employee. *Yancy v. American Petrofina, Inc.,* 768 F.2d 707, 708–09 (5th Cir.1985).

Mobil claims that the trial court erred in granting Mr. Mitchell standing because he has never had a reasonable expectation of returning to covered employment, nor does he have a colorable claim to vested benefits. We agree. After Mr. Mitchell retired on January 1, 1985, he received all of his vested pension benefits in a single lump sum. Although he filed a protest under Mobil's internal procedures, he did not claim that Mobil had improperly withheld vested benefits. He also did not make such a claim in his complaint, nor did he seek reinstatement. Instead, he claimed that Mobil's violation of ERISA entitled him to additional benefits which he would have received had Mobil's amendments to the Plan not compelled him to retire at fifty-six, rather than sixty. Since these benefits had not yet vested, Mr. Mitchell could not have a colorable claim to vested benefits, but only a claim for compensatory damages. Furthermore, Mr. Mitchell never sought reinstatement; therefore, he also could not have a reasonable expectation of returning to covered employment. Because Mr. Mitchell failed to prove that he was still a participant in the Plan, it is inescapable that he did not have standing to seek enforcement of his ERISA claims. The trial court's holding that Mr. Mitchell is entitled to recover under ERISA, therefore, must be reversed.

For the foregoing reasons, we REVERSE the judgments of the district court.